Good morning. We're on record in case number 10-99009, Sanders v. Cullen. We have just the one case on the calendar this morning, and we're ready to hear arguments, so you may begin. Good morning, Verna Weifold and Gail Ivins, on behalf of Ricardo Sanders v. Appellant. Counsel, before you begin, we were just told a few minutes ago that you have a request to use some exhibits this morning. I don't know whether there's any objection. Okay, so when you come to 987, which is the photograph of the lineup. Oh, you know, Your Honor, I did not bring that one with me. Oh. The only – I narrowed it down. Okay. Well, we can discuss it, certainly, but I – You have 1480, which is the carnival photo of the – I didn't bring that one either. I apologize. Which one do you want to use? I think there's a miscommunication. No, I did initially say that we pared it down, given the three exhibits that I have today are the prosecution's notes regarding Leslie White. 418 and 429. Yes. And I've shown the blow-up. Well, that's fine. That's fine. I think there was just a miscommunication. I had five of them. Well, I had initially intended to bring all of those blow-ups, and given the amount of time, I tried to narrow it down. Go right ahead. Okay. Thank you for the clarification. Mistaken eyewitness identification, lying criminal informants, and prosecutorial misconduct are the leading causes of wrongful convictions, and this case has an abundance of all three of those factors. In 1995, Mr. Sanders filed a habeas corpus petition in the California Supreme Court detailing all of the misconduct in this case with numerous exhibits, solid, credible evidence in the form of transcripts and notes in the prosecutor's own handwriting that detailed the tampering of witnesses in this case, tampering of evidence, manufacturing of evidence. And here we are, and beyond any fair-minded, excuse me, beyond any possibility of fair-minded disagreement, that he made a prima facie case, and he was entitled to an order to show cause, discovery, and an evidentiary hearing. And here we are, 22 years later, and he has yet to have discovery or an evidentiary hearing. The two witnesses that I wish to discuss this morning, of course, I'll be happy to answer whatever questions the Court has, but the two witnesses that I wish to discuss are the jailhouse informants, Leslie White, who's being used behind the scenes, and Bruce Woods, who is on that bus, that little van with Mr. Sanders. So, of course, the first question we have, I'm sure, is why does it matter about Leslie White and what he was up to? First, what did Leslie White say, and is there any proof that what he was saying about his shenanigans with Rogaway behind the scenes were true? Two, does it make any difference? And three, was that information suppressed? First, Leslie White testified after the jailhouse informant scandal broke that he was being released on these illegal furloughs, that while he was gallivanting about Los Angeles, that he was having a sexual relationship with Tammy Rogaway, who was one of the eyewitnesses in this case, a very vulnerable victim eyewitness. Counsel, do you have anything in the record to tell us when that relationship started? We don't know specifically, but what we do know is that at the discovery hearing that took place on February, I believe it is, I'm trying to remember, February 24, 1982, Miss Abramson asked for a discovery hearing because she had some inkling that Leslie White was tampering with defense witnesses. She had some inkling that Tammy Rogaway was involved with other prison inmates, one of whom was Rodney Quine, who was sending these letters, and there were so many informants trying to get, as they used to call it, get in the car, so to speak. There was an evidentiary hearing. Leslie White was kind of flip-flopping in terms of his dealing with the defense. Mr. Gist testified under Rose that Tammy Rogaway was involved with Leslie White in a quote-unquote romantically sorted sort of way. So that's the first we learn that there was this relationship, but we don't know the whole truth. And I think it's important in terms of – Just to be clear, forgive me for interrupting, but you got some of this information later, long after the trial pursuant to public record disclosure request, but when you said just then we don't know the full truth, you mean at the time before trial you didn't know the full truth? No. Okay. And so what was left out from what was not disclosed at the time of the 402 hearing, please? What was not disclosed was that, in fact, Leslie White was an agent of the prosecution, and what was not disclosed was that Leslie White wasn't just having a visit at the jail with – according to Mr. Gist, Tammy Rogaway went with this woman, Gina Gutierrez, to see Rodney Klein, and she met Leslie White and met him up that way. But not simultaneously, right? My understanding from the record is those two events happened months apart. That I'm not sure about because I think Mr. Gist was kind of vague about what exactly was going on. But what I want to emphasize about what was not known and why this actual relationship was not known, I would really like, first of all, to quote something from Williamson versus the United States. It's an opinion of Justice O'Connor. It's just a quote. It's not the holding. But she says, one of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature. And that is 512, 594 at page 599. Counsel, to this day, is there any indication that Leslie White's relationship with Tammy Rogaway infected her identification from the video of the live lineup? I know there's another issue on the lost card and all that, but there were officers who testified that she did identify Mr. Sanders from the video. So do we know whether Leslie White had a relationship with Tammy Rogaway at the time that she made that identification? We don't know that, but I would like to discuss that lineup identification because that's very important. Let's go back to the preliminary hearing. Which preliminary hearing? The preliminary hearing for Mr. Sanders, the joint one for Mr. Sanders. So March 19th. Exactly. Okay. And at that preliminary hearing, on direct examination by Mr. Giss, the prosecutor, he says, you did not, it's a leading question even, you did not identify anybody at that video lineup, did you? And she says, no. Okay. So that testimony right there is buried, and it's a little problematic because there's several, I think three questions about her ability to identify Freeman. Freeman, Freeman, Freeman, and then it says, you didn't pick anybody out of the lineup, and she says, Ms. Rogaway says no, and then the next question again is back to a question about Freeman. So by my read, and I just want to give you a third chance to respond. Sure. By my read, that page, if you will, of transcript, when I read the whole thing together, it's hard for me to know whether Ms. Rogaway intended to be saying that she didn't pick Freeman or whether she's intending to say that she really didn't pick anybody at all out of the video lineup on January 2nd. Well, first of all, the word anybody is anybody, but what happened further on in that preliminary hearing does show that she did not identify Sanders. Because what happened? During that preliminary hearing, Mr. Sanders was sitting behind a blackboard. Right. Okay. And Mr. Brody, who was the defense counsel at the time, when they get through the direct and cross-examination, Mr. Brody then says, I object to any in-court identification because she just said she didn't identify him at the video lineup. And so any identification in this courtroom would be suggestive. And Mr. Gist does not disagree with that. But the judge overrules the objection. They remove the blackboard, and she says simply, he was there. Now, in terms of losing her lineup card, I mean, I think that's the other one of these problems here. You know, in Kyles v. Whitley, they talk about the salopy police investigation. Her lineup card, after she has testified at the preliminary hearing that she didn't identify anybody, the lineup card mysteriously disappears. There's no contemporary evidence that she, in fact, did identify him. How did she testify at the earlier preliminary hearing for Mr. Freeman? This is what happened at the preliminary hearing for Freeman, which was a separate hearing. She does not identify him. She remains in the courtroom, and she sees, I believe it was Rhonda Robinson who says that she can identify him. So then she approaches the prosecutor, and she says, oh, yeah, now I can identify him. He lets her take the stand. She identifies him. But Mr. Gist is very concerned about that. He knows that that can easily be shown. She's very easily manipulated and suggestible. And so he says, and this is the first, you know, I wanted to show. In the notes that I'm going to give you. Counsel, when you're speaking, you're going to need to be at the microphone. So do you want to pull that, because I can tell you, at least from my part, I can't see that. I can move it. Would you please? Please, of course. Just so we can see it, if you want to use it. You want to help me? Okay. Okay. Thank you. So this is the note that Harvey Gist wrote in which he's talking about Freeman's trial, because Freeman has a separate trial. And he says, at Brogaway, only for injuries and not for identification, as it opens up a whole can of worms, reprisoned visits, and Leslie White. So just for the record, you've got this big blowup. And there are two Bates numbers on it. The Bates number here is for the ER record, 1407. Okay. Go right ahead. That is for the ER. This is my state thing here. So in any event, what is very clear is that Tammy Brogaway is vulnerable. She's easily suggestible, and the prosecution is aware of that. And why do we know that Harvey Gist was aware before he testified on February the 24th that, in fact, the relationship was more than just a bunch of, you know, some visits at the jail? How do we know that, in fact, they took place outside of the jail? Because of this other note. Of course, we have Leslie White's testimony, which was kind of shocking. Now you're pointing to ER 1393. That's correct. Go right ahead. Okay. So this is the note. It's dated 21782, which is a week before he testifies at that discovery hearing. And here's the note. It says, Les had a conjugal visit with Tammy. Counsel, can you help me out with the note before you get to that? Look at the top. Do you see it says 21782? Yes. The next line down refers to in court on 12-12-82. It says to me like he's talking to her on 12-12-82. You know, Harvey Gist has never submitted any declarations trying to. So December comes after February. So I don't know if that means that the 2 on 21782, the note was actually supposed to be dated 12-17-82. Or it's probably 12-12-81. We don't know. It could be a mistake. You highlighted the 21782 number. And I think that your argument is that it was created in February. I don't know that. And I'm asking you to help me place it if that's important to your argument. Well, I think it is important. But, again, we haven't had an evidentiary hearing. Harvey Gist has never testified. He's never submitted any kind of a declaration interpreting these notes. It's possible that this is a mistake or that is a mistake. We don't know. But what is important, I think, is that let's look at that note in comparison to what Leslie White testified. He testified as a defense witness in the case of People v. Marshall and Harris, that he was being released on these furloughs, that he was having this relationship with, at the time, he doesn't name it, but it's very clear that it's Roboay. And he says that he passed information on to her that he learned from the jail, much of which that he knew was untrue and was detrimental to the defendants in that case. What's your best evidence that that happened, that sequence of events happened, before she identified Sanders? I think that gets back to Judge Wynn's question. That's what we're trying to figure out. Identified him at what point? In court? Anywhere. Anytime. So there's the January 2nd video lineup, and then you know the sequence because you've just gone through it. There's the two preliminary hearings, of course, the 402 hearing and then her testimony at trial. And we have all of those dates, but what I don't have is a date, and I've really looked, so I welcome your help, about when the relationship you're just describing started. Well, it clearly took place sometime on the dates of those furlough orders, and we have the furlough orders. The furlough orders show that he was being released sometime between October the 14th, 1981, which is the first furlough order, and December the 9th, 1981, which is the last furlough order. And those are the ones that we were able to get. Those were turned over to the state public defender's office when the jailhouse informant scandal broke, and they were still in record correction and before the automatic appeal had been decided. But Leslie White testified at length before the grand jury that investigated the jailhouse informant scandal about what was going on. Is your argument that the state court's fact-finding process was constitutionally infirm because you weren't given an evidentiary hearing? Absolutely. So if that's the case, of course, we would have to find this unreasonable, and I think opposing counsel is going to want to talk about the other eyewitness. I would be happy to talk to the other eyewitnesses. So why would it be unreasonable for the state court to have decided that your client was not entitled to an evidentiary hearing because of the eyewitness testimony provided by Mr. Molloy? Well, Mr. Molloy, for example, let's go back to Kiles v. Whitley, because we were talking about tainted eyewitness identification based upon, say, Brady violations in that particular case. And what the United States Supreme Court made very clear that the lower courts keep getting this wrong. Mr. Molloy has – there are problems with his testimony as well, but let's just say because he was their star witness and they're going to argue that today. And, you know, he clearly – so we have Rogaway, we have Rhonda Robinson, we have Mr. Luna, and we have Michael Molloy. But as Kiles v. Whitley says, this is not a sufficiency of evidence test. Once the one eyewitness's credibility is tainted, you can still reverse, even if the taint does not extend to every eyewitness, and that's in Kiles v. Whitley. And the second thing – But how was Mr. Molloy's testimony tainted? Mr. Molloy's testimony – let's go back a second without using the word taint at first. Let's say Mr. Molloy's testimony was – I think that I mean affected by some sort of suggestions before he made that identification. I do believe that we can say that his testimony is tainted for a couple of reasons. Apart from the inconsistent descriptions, we have the fact that somebody – he insisted on direct examination that somebody wrote the word positive on his line-up card and that that was not his handwriting. But we also have David Lynn – Before you leave that, and I don't want you to feel like you have to rush today because we're going to take all the time we need. Sure. But my understanding is that he thought that didn't look like his handwriting, but he said unequivocally that that had been his identification. Is that right? He does say that. But what – we have to look at all of the identification testimony in this case together. We know that eyewitness identification is – Very important, and I don't mean to interrupt you. No, no, I know. So please go back to answering Judge Wynn's question. I just wanted to – Sure. You mentioned the handwritten note on the card. I want to make sure we take these as they come up, and really, really careful with the records. So go right ahead. You were explaining about why you think Molloy's testimony is – his eyewitness testimony may have been – I think you're trying not to use the word tainted, but – Okay. But there are problems. His eyewitness identification is not rock solid and unequivocal, and that we can execute somebody solely on the basis of the testimony of Michael Molloy. And I would like to mention David Lind. Okay, before you get to David Lind, can you finish Mr. Molloy, please? You were answering Judge Wynn's question about why is that eyewitness identification not, as you put it, rock solid. It's not rock solid because he gave numerous inconsistent descriptions of the robbers. Because, you know, there went from red eyes to golden eyes to how tall he was and that sort of thing. There are numerous inconsistencies in the record that Ms. Abramson went over with him at length. We don't know exactly what he saw at that video line-up because – and I think it's not even quite clear to me what line-up, what video line-up, or what line-up he actually saw. Well, he wasn't – before you pass that, I think it's uncontested he wasn't present at the video line-up because he was late that day. You mean the live line-up? I misspoke. Thank you so much. No, that's okay. He said that he was released from the hospital, headed down there, didn't make it in time, so that he saw on December 23rd, I think, only the video line-up. Is that your understanding? That is my understanding. That's certainly what the prosecution contended. Okay. Given that, then I'm not – I need a little help with your statement about it's not – we're not sure what he saw because it seems to me we're real sure. If he saw the video line-up, we've got that. So can you help me out with that? Because there was extensive testimony about what exactly – what video he actually saw. Because Detective Stalka admitted during the defense case that the video – because there are numerous different videos that were taken, and we don't know if the video that Malloy actually saw showed that Sanders was barefoot. And it also goes back to the – Are you saying that there are numerous videos of the live line-up that included Sanders, or are you talking about video of line-ups including – that included other people? I'm talking about videos that were taken of the line-up that included Sanders. There certainly were other line-ups. I'm not talking about those. But that – More than one video that included Sanders? That's correct. Because Detective Stalka said on – during the defense case that it's quite possible that the video that Mr. Malloy saw showed that Sanders does not have shoes on because the video that I submitted to the court and that was – you know, we got from the – does not show that he's barefoot. But you think that we find this in the record and the transcript of the trial transcript? Yes. Detective Stalka – and I'm sorry I don't have it at my ready, but I do mention it in the opening brief. But Detective Stalka says that if he had noticed that Sanders did not have shoes on, he probably would have put shoes on him. And it's the video line-up that Malloy saw, it's possible that he did – that it did show that he was not wearing shoes. I think I've read that testimony. I'll go back and double-check. My recollection is that he said he thought that the folks who were actually in the room would not have seen bare feet. Is that – am I right that far? I think he – you know, I think he may have said that. But, you know, think about the fact is that that's not what – that's what the officer said. That's not what the witness said. Okay. So does any witness say they saw bare feet? I don't believe that that is. Okay. And then getting back to Judge Wynn's question, because Malloy, of course, wasn't in the room. He saw the video that day. And now you're explaining that you think there may have been, according to this witness, more than one video? That's correct. With Sanders in it. That's correct. It's the same – different videos, different taping of the same lineup. But I also want to talk about the lineup itself, which also affects Mr. Malloy's – the accuracy of Mr. Malloy's testimony. Remember, Mr. Sanders, when he was arrested, was severely beaten by the police. He was – there's no evidence at all. Nobody testified that he resisted arrest. He was beaten so badly that he had subcutaneous emphysema and three broken ribs. Without giving him medical attention, they put him in that lineup. Now, of course, you know, the injuries that he sustained were not visible. But if you watch the lineup – if you look at it carefully, and it's subtle, the subtle suggestions. He has trouble breathing. And the video – he's in the center. The videos – he's always being watched. Everybody else standing in that lineup has a nice, nonchalant kind of expression on their face. He looks terrified. And when they ask him to speak, he can hardly speak. And he can hardly walk. He has – walking very guardedly. And if you don't know why he's like that, you would think maybe he's guilty – he's feeling guilty or he's scared or something like that. It's subtly suggestive. And Ms. Abramson argued that the lineup was unfair. So we have – we don't know exactly what video Mr. Malloy saw. We have his inconsistent descriptions. We have the video lineup. We have the fact that somebody wrote on his lineup card. And then we have – and I want to talk about writing on – or he thinks perhaps that somebody wrote the word positive on his lineup card. We know today there is absolutely no dispute that the fact that somebody says that they're positive has no relationship scientifically to any accuracy. So we have that. And then we go over to the fact that – and I really want to talk about David Lynn because I think that this is very important. I realize that we have a separate argument, but it does affect his – the accuracy of his identification. Now, David Lynn, who was the security manager, whatever it is, the head of security for Bob's Big Boy, he was clearly a prosecution agent. He was the liaison between the police and the prosecutor and the witnesses. He shepherded them to and from court. And it was more than just a chauffeur. As I was preparing here, volume 27 of the ER, page 7596, when they are in the pretrial discussions and there's – and all the lawyers are fighting and, you know, there's still Freeman's lawyers. And then Mr. Giss – the defense attorneys are complaining that the eyewitnesses will not speak to them. And Mr. Giss, he says, quote, I told Dave Lynn to call every witness from Bob's and tell them not to talk to anyone unless I was first called because what I was going to simply demand was that they not talk to anyone from Ms. Coppleside and so on. So Mr. Giss is saying that he's actually using David Lynn as a liaison to these witnesses. Now, David Lynn is seriously compromised because Bob's Big Boy has a lot riding on the line financially. It's not like the prosecutors who are supposed to seek justice and to find the truth. David Lynn is concerned about the liability of Bob's Big Boy financially. He admitted and he testified not only that there was a reward offered by Bob's Big Boy, which the informants are clamoring for, but all of these witnesses had sued Bob's Big Boy. They had lawsuits, Rugaway, for example, and also the, you know, work miscompensation claims. Let's assume that that's true, that David Lynn, working for Bob's Big Boy, felt some vested interest in helping the prosecution. As I understand your claim, the deposition some years after the trial, Mr. Malloy testified that David Lynn had contacted him and said to come downtown and identify some guys. Was there any suggestion that David Lynn somehow participated in the lineup or pointed Mr. Malloy to Sanders in any way or said he had to identify somebody from that particular lineup? Certainly, I don't have that specific information. That would be something that an evidentiary hearing and discovery would let us find out. But what I do have in making my circumstantial case is that Derwin Logan said in the proceedings, and that's in my brief, and I'm sorry I don't have the ER site embedded into my brain, but it's there. He said that David Lynn told him to go down to the lineup and that it's good news because they've arrested someone and the police think he did it. Now, what else he told these witnesses, we have no idea, but this is very suspicious. That's what Lynn told Logan? Right. But because Lynn is basically the handler for every single one of these witnesses, and because it is self-evident that his interest in seeing somebody convicted is far different from the prosecution who simply wants to win a big case, we have here the fact that Rodell Mitchell and Andre Gilchrist and Brenda Givens gave some indication, whether it's true or not, that Bob's big boy had been warned that they were going to be robbed. We don't know exactly when that took place. That's always a mystery, and there's no written verification that they were robbed. But can you imagine? I mean, Bob's big boy, it's not just their liability to the employees and the patrons in the restaurant who were injured by this, but it's a nationwide chain of restaurants. Who's going to want to eat in Bob's big boy after this happened? I mean, particularly if they had been warned and they did nothing. So we don't know if they had been warned. That's still up in the air. But, in fact, because of what they testified at Rogaway's lawsuit, they went out of their way to make Rodell Mitchell look like he had been lying. So we don't know, but he's clearly compromised. And he spends a lot of time, David Lynn spends a lot of time with Michael Malloy, and Michael Malloy was on the witness stand for several days, and David Lynn was there. So your argument, as I understand it, is that you're asking us to find it a reasonable assumption that Lynn made this statement to Logan and that he must have said the same thing to Malloy. And that that was impermissibly suggestive. Have I got it? Yes. All right. Yes. And the other factor that I wanted to talk about in terms of Malloy's, why his testimony cannot be relied on to execute Mr. Sanders, because there was also the Carnival photo, and I'm sorry I didn't bring the whole thing. We've all seen it. It's in the record. It's in the record. But this is, I mean, it's pretty extraordinary because Malloy testified in the 402 hearing in Mr. Freeman's subsequent trial that he saw that photograph. Now, think about this. Here's all these eyewitnesses in one of, you know, this notorious, horrifying case. They're all being brought to court to testify at the preliminary hearing. They have the witness waiting room where all the witnesses are before they're being called into the room. And the police have left the evidence notebooks in that room. That's unbelievable. I have this, you know, I've never heard that before or since. And then they open it up and they see this Carnival photograph. But does anybody know, for example, that it's a Carnival photograph, that it's a gag photo, and that it's done as a toy? I mean, if it were me, if I were Rhonda Robinson or Michael Malloy, I would be like, oh, my God. There's no doubt that this is the right guy. Can I back up about that? There's a, one issue is whether they saw the photo and when, and whether the folks were truthful about that. But if I could just establish first, I think the record tells me that that photo wasn't introduced by the prosecution, but that it was introduced by the defense. That one of the officers mentioned it, I think, at Sanders' testimony, and then the defense actually offered it and then also called the gentleman who ran the photo booth to explain that it was a sort of a gag photo at an amusement park, basically. Have I, I want to make sure I have that sentence right. Yes, that's correct. That's correct. Okay, so then getting back to your point when you said no, who knew. You mean, as of the time of the preliminary hearing when they were back in the room, would the witnesses have had reason to know that it was a gag photo? No, they did not. I'm trying to understand your argument. Yeah, exactly. Okay. That the witnesses, the vulnerable victim eyewitnesses who had been subjected to, obviously, a very terrifying event, and, you know, are unsure of what's going on, brought to this witness waiting room to go in to testify, and there sits that photograph, and nobody tells them that it's a carnival photograph, that it's a gag photo. And I think this is important. Harvey, because Ms. Abramson attempted to try to find out what was going on. She says, one of the other witnesses said, did you know that they're over there and they've got this photograph there? This was the one piece of evidence that Judge Eidman excluded from the prosecution's case in chief because it was too inflammatory. Okay. Hang on. Sometimes this sounds like a Brady claim in your briefing, as though they didn't disclose that the witnesses had this exposure to this photo, and sometimes it sounds like a Simmons claim, and I just want to ask, what is the clearly established Supreme Court authority you're relying on for this claim? Clearly, it's a Brady claim. They did not disclose that they had, in fact, left this photograph in the witness waiting room and that Mr. Gibbs went out of his way to cut off further cross-examination about it. And the thing is, once this issue came up that the witnesses have been exposed to this photograph without knowing the truth of it, didn't Mr. Gibbs, under the clearly established authority, have a duty to find out what was going on? I mean, prosecutors have a responsibility here. This isn't a gladiator contest. But he should have done something. Let's talk about materiality because, of course, Brady's a two-prong argument. Absolutely. And there were four eyewitnesses at trial. That's right. And I think that Mr. Malloy was late, but he was there on December 23rd and saw the video. And my understanding is that Mr. Luna, who was, I think, at the time a teenager, was not injured in the shooting, and so he was also there and witnessed the live lineup. Is that right? I believe that's correct, yes. So he had, I think, right, so that's sort of the timing on that. And then Robinson was there on December 23rd in person? Yes. Okay. And we've established Tammy Rogue wasn't. She came and watched the video on January 2nd. Correct. Okay. So the preliminary hearing that you're talking about with the notebooks and that photo in particular were made available to the witnesses, that was the February preliminary hearing? That's correct. Okay. So just backing up, when we get to materiality, because the prosecution is going to, I imagine, want to talk about this, so I'd like to hear your side of the argument. Absolutely. That Malloy had already identified, unequivocally identified Mr. Sanders from the video lineup. That Mr. Luna had identified, Mr. Luna was pretty wobbly, I think, in his identifications. And then you have Rogoway and Robinson, who we've already talked about, the extent to which they were, were not certain in their identification. So does this Brady argument come back on the materiality prong? Does it circle back to Malloy? It does circle back to Malloy, but it doesn't destroy the materiality argument, not one bit. Because let's just say that, and I'm going back because Kyle versus Litley is a very similar kind of case, and we look at the materiality as it has to be assessed collectively, not item by item, and that when you show that there have been Brady violations with regard to many eyewitnesses, you can still reverse and order a new trial, even if the Brady violations don't extend to all of the witnesses. And so that would be, of course, the fallback position for the prosecution, obviously, is going to be Mr. Malloy. But let's just say we agree that, you know, Rogoway's testimony is highly suspect, and that Ron and Robinson's testimony is suspect, and Luna's testimony is suspect. But will we like Malloy? That totally puts the case in a different light. There's a reasonable probability that undermines confidence in the outcome of this case. Mr. Sanders does not have to prove that he would have been acquitted had there been no Brady violations. And he does not have to prove that, for example, the prosecution cannot survive the misconduct in this case by a sufficiency of evidence test. It is not as if to say, well, let's just remove all of that here and there's enough left to convict. That's not the standard. May I ask you, when did the defense first learn about that photo being available in the blue notebook being available in the Freeman preliminary hearing waiting area? Well, again, I believe that Ms. Abramson, because of the colloquy that went on in her attempt to try to cross-examine further when she was not allowed and then it was just basically shut off. Sorry, are you now referring to the trial or are you talking about the 402 hearing? The trial. Okay. At the trial, it was not resolved as to whether or not they had really seen this. Mr. Giss did not want to allow Ms. Abramson to continue to go into this area with Rhonda Robinson. Can I, forgive me, we're not communicating, but it's probably my fault. No, no, no. I'm just trying to figure out when did the defense know this was an issue? Because this is a Brady claim and your argument is that the prosecution didn't disclose this to you. But, of course, it's in the trial transcript to some extent, so you knew then. But did the defense know any earlier than that? There's a reason Ms. Abramson knew to ask the question. I believe that while they were in court, and this was not the preliminary hearing. This is the trial. Ms. Abramson did not handle the preliminary hearing. She only handled the trial. Right. There were 402 hearings, and that's what's causing me to have the question about when the defense first learned about that photo. The defense? It was seized, I think, from, let me just back up. Maybe this will help. That photo was seized from when Mr. Sanders was arrested. Correct. When he's home. Right. That's correct. Okay. And so you don't know at what point it was produced. What do you mean by produced? Certainly the defense knew that there was this carnival photograph. They just didn't know that the witness may have seen it. Exactly. Until sometime before trial. I thought on cross-examination of Givens that actually defense counsel elicited from Givens that in fact Molloy was one of the people in the room. That is correct. So the defense lawyer knew all of the information that you claim was suppressed during the trial. I just don't see how that could be the basis for a Brady claim. Well, because at the time Brenda Givens is not an eyewitness. But Robinson was. Robinson knew about this and she said she wasn't sure who was in the room. Givens testified that she did know who was in the room because she saw Molloy in the room when the books were there. So I guess I'm just puzzled as to why you think this is a Brady violation. Because I think that timing is of the essence in this case. Because where it should have been fully disclosed was at the time that Rhonda Robinson was on the witness stand. And if there's any failure, there's clearly something that she wanted to go into at that time that would have affected Rhonda Robinson's eyewitness identification. And Mr. Giss cut off all further inquiry. And so at that time, because Brady violations, timing is always of the essence. But that's what I was trying to get at in response to this. I agree with Judge Wofford. There's this issue about Givens being pretty, whether she's right or not, I don't know. But she certainly identified Molloy as being in the room. But Robinson was questioned about this and was unsure about who was in the room. I can't understand your argument that the defense counsel didn't know when Robinson was on the stand that Robinson had seen that notebook. She denied, during the Sanders trial, she denied seeing these notebooks. Well, I think there's a discrepancy about whether she denied the notebook or the photo, seeing the notebook or seeing the photo. Was she ever asked directly whether she saw the photo? No, she was not. What happened was that her testimony at the trial was leading, and Abramson was attempting to try to get her to admit that she had seen it. And she waffled and she said, no, I didn't see it. She says, did you see this blue notebook? No, I didn't see it. And I think it's only when we get to Freeman's trial and at the 402 hearing that she freely admits that she saw this photograph. But she wasn't asked earlier, I don't believe, ma'am. I'll just tell you, because you're going to come back. I'll just tell you that my read of the record is I can't find any place where Robinson denied seeing the photo. I can't find a place where she was asked about the photo. So I'll just give you that heads up so you can maybe respond when you come back. Did you want to talk about Bruce Wood? Yes, I would love to talk about Bruce Wood. In terms of what happened at the trial, okay, Bruce Woods is in the jail. He freely admits that this was at the preliminary hearing, the joint preliminary hearing with Mr. Sanders and Ms. Stewart, that he's in the jail, he wants to know how he can get out. Some other inmate tells him, well, you know, call up and see if you can offer something to the prosecution, because he claims that earlier, I don't know that there was any specific date that it was pinpointed to, but that he was riding in a car with someone named Connie and someone called Collie, who he claims is to be Carly's steward, and that he had been asked, or there had just been discussion about, quote, taking down Bob's big boy. That's the testimony at the preliminary hearing. Then he surfaces at the trial. That's at Sanders' preliminary hearing. It's a joint preliminary hearing. I mean, not Freeman's, it's the Mark's preliminary hearing. Right, exactly. So at the trial, he surfaces with a statement that Mr. Sanders allegedly made to him, and the testimony that is elicited at the trial about what happened is that Woods testifies that he has this keep-away order. He's not supposed to be in the same van or same bus, jail bus, going back and forth between the jail and the courthouse because of this keep-away order, and oops, they put him on this bus, or it was a van, and there was a very specific testimony about it. It was a station wagon. There was only one other person besides Sanders and Woods in this little station wagon, and it goes to the jail, and then in that short bus ride, Woods claims that Sanders threatens him, that Sanders says, you know, why are you going after Carlita, she's young, and we know where you live, and if I'm convicted, they'll give me the gas. And the prosecution at this stage of the case, I think, is trying to argue that that's not a big deal. But that was a really, really big deal because Harvey Giff, in his closing argument, he says, what a godsend Bruce Woods is, a quote-unquote godsend. The sheriff's department screwed up. Wow, what a godsend. They screwed up, and they put Woods on the same van or same bus with Sanders, and he makes a very damning statement. He even said that Bruce Woods was the coup de grace about this whole case. Now, this is 1982, before the scandal is full-blown. Mrs. Abramson's closing argument is, you know, because how can you say that that didn't happen? You know what I mean? But her argument is that, oh, the sheriff's department doesn't make mistakes. He's lying. He's clearly lying because they don't make mistakes like that. But flash forward to the jailhouse informant scandal, which was heavily investigated by the independent prosecutor. It was called judges and prosecutors and informants and deputies and all kinds of people. And what they concluded was that, I mean, this pattern of placing informants, deliberately placing informants with defendants, particularly in high-profile cases, to make it look like they had overheard something resulted in false claims of confessions. That is exactly what the grand jury found. And, in fact, in that video, which is part of the evidence in the habeas evidence, Leslie White demonstrates, you know, clearly, I mean, in that particular video, he's talking about how he can get confidential information. What Bruce Woods testified to is anybody can just make that up. He threatened me, you know, whatever it is. It's not something that is unique to, that only the defendant would know. I mean, it's ridiculous. But, yes. Are you relying on Messiah here? Am I relying on? The clearly established federal law. Are you relying on Messiah? Yes, I am. Yes, I am. So under Messiah, do you have to show that the government arranged this as opposed to making a mistake? Yes, I do have to show that they arranged it. And that is what I am alleging. And the reason that I am alleging that is because we have this grand jury findings. We're not saying that further development would not shore up our claim and prove it, you know. Your argument is that it fits into the pattern. Absolutely. Absolutely. It is a classic jailhouse informant maneuver. It's a paradigm. But it's not the case that you were unaware of this. He was cross-Woods, was certainly subject to cross-examination at the time of the trial when he made this revelation. And so I'm struggling a little bit to figure out whether or not at one point in the briefing I thought you were sort of contending that you were entitled to an evidentiary in hurry and didn't get it. Yes. But Woods was actually on the stand when this came out and he was cross-examined. So exactly what is your argument? My argument is that, and that's why I mentioned how Leslie Abramson tried to deal with Bruce Woods in her closing argument. She's saying, oh, you know, come on, this is ridiculous because the Sheriff's Department doesn't screw up and put informants on the same bus with defendants. But it was not until the revelation when Leslie White went on 60 Minutes in 1988 and exposed without any question how these informants were manipulating the district attorney's office. It was like a symbiotic relationship. This big confidence game and that one, and that the crucial final touch in order to make these so-called jailhouse confessions believable is to get themselves placed on a bus or something like that with the defendant. And the grand jury said, you know, we have heard an unbelievable number of confessions taking place on these short bus rides from the county jail to, excuse me, the courthouse to the county jail. And they made a finding that the district attorney and the Sheriff's Department had violated their ethical responsibilities, that they had not in fact been scrupulous in keeping informants and defendants together. And that they had in fact intentionally placed them together, which is the result that false claims of confessions would arise. And Ms. Abramson could not possibly have dreamed that this was being done deliberately in order to show that – to make his encounter with Mr. Sanders believable. There's no way she could have known that. And the revelations in which we make this argument came years after – What happened when you found out about the scandal? Did you request an evidentiary hearing on this issue? We – when I filed the habeas corpus petition in the California Supreme Court, we clearly requested an evidentiary hearing. On this issue? On everything. The way you file a habeas petition in the state court in the prayer for relief, the prayer for relief is to grant the petition – grant an evidentiary hearing, discovery, take judicial notice of all of these records, that sort of thing. We clearly asked for that on everything. In your federal habeas petition, did you make a Taylor v. Maddox argument about the denial of that hearing, the state's fact-finding process? Or what is it that we have before us where this is exhausted? It's – you mean this Woods claim? Uh-huh. It's exhausted because all of the grand jury – the grand jury reports and all of the evidence regarding the grand jury scandal, Leslie White's testimony or his performance on 60 Minutes, every single piece of evidence that we have put in our lengthy 64 volumes of record was given to the California Supreme Court. What – That's never been an issue here. You requested a certificate of appealability on, I think, 19 claims, and you have a certificate of appealability for 18 claims. Yes. All of the habeas claims were granted except for the last claim. So I'm trying to figure out where the denial of – is there a Taylor v. Maddox claim in here? What is your – where does this fit? Well, the claim is that we were never afforded an evidentiary hearing. Right. And so do you have a claim here for the lack of an evidentiary hearing arising from Woods and the Messiah claim? Well, we did – in the opening brief, we do argue that some of these claims we could get relief, like Sander James v. Ryan, without an evidentiary hearing, but that court cannot deny relief without an evidentiary hearing. And specifically, Woods is one of those claims that we would need an evidentiary hearing on. So I asked you a minute ago, and I'm not trying to be tricky here, but I'm really trying to be clear, whether the Bruce Woods claim is a Messiah claim, and you said yes. It is a Messiah claim, and it's also a NAPU claim. Is it anything else? Well, you know, I suppose I should have pled it as a discovery claim, and I did not. Let me just check. Between your presentations, we're going to take a brief break, but I want to make sure – any questions? No? Are you ready to take a break then? Anything else you want to say before we take a brief recess? No. I'm happy to take a break. Thank you. All right. We'll be back in, I don't know, five minutes or so. Okay. Thank you. All rise. This court stands at recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Welcome to the 2020 World Bank All rise All rise All rise All rise First session hear from hear from the government The government The government    Please be seated Please be seated How long did Robinson say she saw Sanders I Don't have the exact time that Robinson said she She saw or observed Sanders And when I say I'm full opportunity, but certainly without dispute Michael Malloy had the most opportunity to observe. Mr Sanders because he was following his instructions from Sanders to get the money and to get property from the victims themselves Do you know how long he said he had to observe? Mr. Sanders? I don't know exactly what he said But we know that for the majority of the time that the robbery was happening Malloy was with Robinson because Malloy was the manager He was ordered to give him the money to put the money in a bag and to collect the property from the other victims in a bucket So turning first to the Tammy Rogoway claims the Brady claims for Brady claim fails for one simple reason and that's because it's clear from the record that Harvey gets disclosed the relationship between Tammy Rogoway and Leslie white. There was nothing there that was not disclosed and It's clear from the record that trial counsel knew there was a romantic sexual relationship with between white and Rogoway and in fact, this was the reason that Gifts was reluctant to use Rogoway in the first place not because white was a prosecution or was an agent of the prosecution but because he was Rogoway apparently came from a good family as he characterized it and Because of her sordid relationship with white. He didn't really want to kind of air that out during the trial itself Speaking of Deputy DA. Yes. Do you have any information to share regarding the note and I'm speaking of er 1393 and the discrepancy between the two dates on that note I have no I can't unfortunately shed any light on that Of course, we would be speculating as to why there's a difference in the dates there But no, I do not have any information as to why there's a discrepancy in the dates. Well, I wasn't the note produced That's why that's why we don't know counsel because the note wasn't produced correct So there wasn't an opportunity tell long after the trial the person went to I think a request for a public records Request that's correct. Your honor. So there wasn't an opportunity to ask those questions. Would you like to respond to that? Yes So the disclosure here was not every single piece of information That Harvey gifts had about Rogaway and white's relationship The disclosure here is a general the obligation you have is a general obligation to say look I'm going to I've decided to use Tammy Rogoway as a prosecution witness Not only to testify up to what happened to her that night But for identification purposes and therefore because of all the stuff that's come out because Leslie White has told me that this other inmate Quine is trying to turn Tammy It's trying to get information from her to put away Freeman Then I'm gonna I have to turn this over to you because this is certainly relevant to the defense. So what did he turn over? He turned over the letter that Quine had written which gifts represented at this discovery hearing that white himself had turned over to And because again Quine was identified as a defense witness according to Leslie white That that's why he turned over that and then at that same moment at that same time. He also Explained there's a romantic relationship relationship here white is no longer incarcerated because Trial counsel was questioning him about Leslie white where she could find this Leslie white and he said he's no longer incarcerated right now The note indicates that mr. Giff knew that there were what he says another conjugal visit I don't know if that means if he's referring to furloughs White coming out of jail or Tammy Rogoway going into jail to visit White do you know? I don't know what it says. What I do know is that it doesn't represent. It doesn't say White was free and out and therefore he was able to visit with Tammy There's conjugal visit that she had a conjugal visit, right? That's correct. Okay. And so was that disclosed? I said about here All I know is that is that deputy DA gets disclosed that she was involved with white You know assorted sort of way. That's correct. Nothing about conjugal visits or furloughs There was no there was no mention of conjugal visits. That's correct. Your honor. No no mention of furloughs There's no indication that Harvey gets new about these furlough orders the furlough orders that have been Submitted as exhibits. They have nothing to do with Sanders this case. They're in an unrelated case and there's no indication other than White himself testifying at a much later date saying guess knew that I was out on these furlough orders but again, there's no connection here and there's no nexus between Yes, knowing that he's out on these furlough orders and and his relationship with Tammy Rogoway. Well, actually I I'm not sure that That's quite right The testimony that came out later Is to the effect. This is testimony of mr. White That he told Tammy everything and that mr. Giff did know That white testimony is that and he told him to keep his mouth shut or something to that effect I'm paraphrasing but he testified to that he testified to that at separate there were two separate Hearings, I think there was a grand jury testimony and then testimony as an expert witness in an unrelated case. So Looking at what white did say The testimony that he provided as an expert witness in the unrelated criminal case. He said that At one point. He said that he knew about the Bob's big-boy case because his ex-girlfriend Told him everything he told him the whole story. That's how he knew about it he knew she was a victim and that she told him the whole story about the Bob's big-boy case, so There's no indication that White was giving rogue away information To influence her testimony. We do know that at some other point white says I've heard all the stuff going around with other inmates Stuff that was bad for the defense and I just told her everything that was being said in prison This is according to white white testimony. Also that he gave the quine letter to Give yes At the time at the time of the trial, yes, and that's consistent with what gifts Gifts testified to at the discovery hearing. He said that I gave the letter The letter came to I I got it from Leslie white so the the important again the important thing here is there was a disclosure made and There's no Brady violation simply because there's no there's no failure to disclose the nature of the relationship was there The opportunity to go and interview Leslie why interview Klein and figure out what was really going on here because I think the main concern for trial counsel was Leslie white is turning these defense witnesses. I feel like he's he's turning these potential defense witnesses against the defense all of a sudden Miss Abramson said she was very concerned about quine and about white and about rogue away And I believe there was a pretrial ruling that she was not going to be allowed to go into that That is not allowed to question rogue away about that unless quine and white were called at trial That's correct, and then it disappears. Yeah out of the Record that we have here. Is there anything I'm missing about why the defense? May not have chosen to go forward with those witnesses. No, and it could just be that after a defense counsel Investigated further it was a tactical reason not to call white or quine because there was it could be detrimental And I didn't I didn't need you to guess I just want to make sure that I'm not missing any kind of a ruling that would have prevented them from doing so No, all right. No in addition to the Nature of the relationship being disclosed to Sanders before trial there's no materiality here because Rugby had identified Sanders twice before these alleged conjugal visits ever took place and I know judge Kristin you were asking about when this relationship started the Allegations that Sanders has put forth is that these really this these visits had to have started sometime between October 1981 and the time that gifts pen the note February 17 1982 and that was well after Why do you think they would have had to start then in October of 81? Well, the the conjugal visits would have started then so the relationship could have predated that Shirley Surely, yes, it could have we just don't know by how much no, we don't know All right, but we know that on the night of the robbery that ms Rogaway was a Customer in the restaurant with her boyfriend who was murdered. That's correct, Your Honor. And then on January 2nd, there's she she saw this Video lineup, right? Yes, that's correct. All right, and As Far as Rogaway's testimony is concerned at trial. There's absolutely no evidence that that testimony was false. Was it inconsistent? Was it did Sanders's trial counsel? Bring out those inconsistencies prior consistent statements and sort of you know, shed this kind of Curious light on why why there was no line of card here for Rogaway when she supposedly identified Sanders at a At a video lineup that surely was brought out But that doesn't mean that her testimony was false and there's certainly no no allegations and no evidence I should say especially even if we're looking at White's testimony. He never said yes I went and talked to Tammy Rogaway and I influenced her testimony I told her that she should identify Sanders or she should do anything else that was improper in this case. So materiality is not there As far as the Loss of the lineup card that was fully litigated at the trial court level and there was no finding of bad faith And really there's nothing peculiar about the loss of the lineup card here particularly because there were two cards that were lost and those two cards were for Miss Rogaway and For Dion Irvin who both of them attended the same lineup which was at a separate facility on January 2nd on a video lineup And somehow those cards ended up getting lost in the shuffle It's a there's an indication some way that they were lost or may have been lost Since the time of the Freeman preliminary hearing so I just wonder Were they at the Freeman preliminary here? Which does our record tell us that the record isn't clear about that because there seemed to be some confusion about what happened to those cards whether they were actually part of all of the notebooks evidence notebooks that were present And there certainly was an allegation that Freeman's I guess Freeman's previous counsel had taken the cards But certainly that was not explored or even okay, so Because there's no finding of bad faith and further because there's no indication that the card itself was exculpatory There's no trumpet a claim here and the card was not irreplaceable Robo a was able to At the pre-trial video lineup was Certainly less strong than the others who had a lineup card to support that As far as Her identification at the pre-trial video lineup Yeah, are you talking about the January 2nd? That's what I'm talking about. Yeah, okay. All right. Yes. Are you could you discuss this? Notion that there was more than one video tape that the mr. Well, it did include mr. Sanders, please There's no indication whatsoever that there was more than one videotape of Sanders's lineup as far as anybody knows as far as What's contained in the record and even the exhibits that have been submitted by mr. Sanders? There's only been one copy of this video lineup. And so the notion that there's more than one video lineup is speculative at best I Ask you just before you this is nothing to do what you're just talking about but the still photo Yes It shows the folks you could where you can see their feet Was what is where did that come from? And was it used by any of these witnesses to make? Identifications to be honest with your honor. I am not sure It's not clear from the record if it was used and if the still photo was used at all to show To have any of the witnesses identify Sanders from the still vote photo versus from the video lineup. Do you know whether it was admitted? Into evidence at trial, I don't believe that it well, I I don't I I can't speak with confidence As to whether it was admitted into evidence it or not. Okay With regard to Malloy's identification from the video Lineup and his testimony at trial that somebody else appeared to have written positive on his card Remind me did he testify that at the time he made the identification? He was positive, but that it wasn't his handwriting or did that positive? Things come a separate and apart from that. So the testimony is a little confusing but this testimony starts at 28 er 8071 Malloy remembered that when he made the identification he remembered that he was he wrote down positive But when he looked down he he kind of was confused and said I this really doesn't look like my handwriting He wasn't really pressed on it any further He just said it really doesn't look like my handwriting, but that's the part that I wanted you to clarify Yeah, I phrased my question badly, but he did testify that at the time he made the identification He was positive about the investigation. That's correct And actually in fact later on on cross-examination he confirmed that it was his handwriting This was on a different day and he said, you know what that is my handwriting. I did write positive So he said that is my handwriting. No, if I've got this timing, right? Mr. Malloy had been shot in the eye. Yes, he winds up losing an eye from this He did robbery, but he was there on December 23rd. He was late. So he didn't see the actual lineup. He saw the Video of it. Yes, but he So the the if I'm understand the sequence correctly he wrote this he made this notation on the card that day and he would have been Maybe operating with one eye. Yes, that's correct So as far as Malloy's identifications their his pretrial his identification from the video lineup is The reason Well, I have a question about that is there anything in the record about him being Under the influence of any medication that day on December 23rd I don't believe that there is any indication as to whether he was under the influence of any medication. Thank you So just briefly turning to the Brady claim relating to Michael Malloy since we are talking about him The testimony he gave at trial was consistent with the testimony that he gave at the later civil deposition And that's because at trial he was asked if a policeman Ever called him up to tell him you need to go down and identify some suspects and he couldn't remember who had contacted him So at the time we get to the rogue away civil trial He was a deposition. But anyway, it's about five years after the robbery I believe so three years after his trial testimony. That's right, Your Honor Yes, and the line of questioning at the deposition was specifically when did anybody from Bob's talk to you after this incident and then he's relaying he's remembering the time that he was released from the hospital and That's the first time that he spoke with David Lind about the incident and he just simply says No, he just told me I was coming downtown for a lineup identify the guys There's nothing in that testimony that shows that he testified falsely at the at Sanders's trial or that the David Lind improperly suggested to him that he should identify somebody out of that lineup So the Brady both the Brady and the Nepali claims fail for the same reason As far as the carnival photo goes for the Brady claim for any of the witnesses that the allegation is made to The disclosure was there and we know that the disclosure was there because and forgive me I don't have an excerpt of record citation, but I have a reporter's transcript Citation. So this is a 39 RT 9 9 1 2 sorry 39 RT 9 9 1 2. That's correct Okay So this is when trial counsel says I believe I'll be able to prove with a different witness that as Dion So this is assuming Dion Irvin had told both myself and mr Gif at one time while the witnesses were waiting around for one of the prelims by inadvertence We assume police officer suspect book books were was it were in the room with them the suspect book that had pictures of Ricky and Carlita such as the one with The fake Tommy guns and that the witnesses were looking through it and making comments about the pictures. The disclosure was there Thank you, but I think that the trial court had ruled the question is whether it happened or not Just so chronologically the chocolate ruled that the photo couldn't be used by the government at one point, right? Yes Okay, had that ruling been made? At the point that this was stated I don't like the photo at the point the box was left in the room Was there already a pretrial ruling that that government was not going to be allowed to use that photo? I I don't know your honor and then when the folks got to trial when this case advanced the trial That was the rule. Yes, of course ruling and then one of the officers mentioned the photo, right? Yes Yes, am I right that the? Defense offered it at that point. You're correct that they offered it the So going back to why there's no Brady claim it was evident that this was disclosed that the That Sanders was trial counsel knew about the carnival photo and the possible exposure and and indeed She questioned several witnesses about whether they had been exposed to it or not. So there's no failure to disclose here As far as Then a pulley claim at least with regard to Rhonda Robinson She was asked different questions at Sanders's trial than she was at Freeman's his trial. So at Sanders's trial, she was asked do you remember if you saw a Three ring blue binder and she said no I don't remember and then the next question was something to the effect of with anybody's looking Did you see any people any other witnesses looking at photos and she said yes At Freeman's trial she remembered Either the three-ring binder or the box and she actually said yes, I looked at a photo so There's nothing inconsistent about her testimony at Sanders's trial versus at Freeman's trial and certainly Nothing that rises to the level that the prosecutor knew that there was false testimony that Robinson gave at Sanders's trial As Far as as Bruce would Sanders has alleged a messiah claims that even Sanders concedes in the reply brief that the Messiah claim fails because there's no allegation that Bruce would actually ask questions of Sanders while they were in being transported back to jail together. So the messiah claim claim feels for that reason alone and As far as in a pulley claim relating related to woods There's absolutely no evidence that was testified falsely and simply because he was an informant so to speak in this capacity The same its conclusory and therefore on that basis alone the California Supreme Court reasonably rejected it I just briefly want to go back to one thing about roga ways Testimony and the note about the can of worms that Harvey guests had made. This was relating to the Freeman trial The reason that that can of worms Note makes sense in there is because there was that previous allegation that quine was writing to Gina Tammy's friend to ask Tammy to give him information to testify against Freeman and therefore it makes sense that there's that can of worms notation relating to Tammy and her relationship with Quine or white relating to the identification of Freeman In conclusion because there were multiple witnesses involved in a lengthy investigation There were bound to be inconsistencies in the eyewitness accounts But as this court has recognized inconsistencies do not amount to false testimony and as the district court aptly found one thing was consistent one important thing None of the witnesses expressed doubt about their identifications of Sanders indeed Sanders cannot expel mr. Luna certainly did cancel your statements too broad. It's too broad. I apologize back up and try that I'll back that I'll back up and say that at least two if not three of the witnesses were sure of their identification of Sanders At trial, which do you put in the sure category Maloy Maloy? I put Robinson in the short category and I put rogue away in the short category too, because she unequivocally identified him at trial Indeed Sanders cannot explain away the mountain of evidence against him notwithstanding his trained efforts to dismantle it piece by piece Accordingly the state respectfully requests that the district court judgment be affirmed Thank you. Thank you Of course I Don't know what I did with my own take your time Like to clarify All right First of all, we all know what the word conjugal means It's not a visit to the county jail to say hi. How are you doing? Conjugal has a specific meaning in the English language and we all know what that means And he says less had a conjugal visit with Tammy one regular visit. No forms police escort Can I did that say no forms or no favors? It says it looks to me as if it says no forms What do you I'm sorry, but it might say no favors, but this was produced after the trial So we don't know from guess what that says, right and he was the author of the no, we don't okay But I would like to clarify You know it brings up a lot of can of worms because for one thing Tammy broke away was not married to Leslie White and Under the do you think conjugal visit means she went to the jail? well It would be really kind of interesting here because if she did go to the jail and she had a conjugal visit that also would Be illegal. Well, I'm just trying to that says conjugal visit and you just started by saying we all know what conjugal visit means But your briefing talks about illegal furloughs of him leaving the jail may or may not matter but I'm just trying to are you alleging both Happened. Well, you know at this point I really don't know what happened But we do what we do know is based upon Leslie White's very detailed Testimonies that they were meeting outside of the jail when he was on these furloughs And his testimony is very clear that he and Harvey Gibbs Spoke about it and then he that Harvey Gibbs knew all about it So the thing is that what I would say to a conjugal visit maybe you know But clearly conjugal means that they are having more than just a you know A visit behind the glass or over the telephone or whatever it is So whether that took place at the jail, that would be very very interesting because that would be completely illegal So what was not disclosed? That's what you started to say. I've taken you off track. What was not disclosed the sexual relationship between Rogoway and white was not disclosed and what was not disclosed was the relationship between Harvey Gibbs and Leslie white miss Abramson I thought that Harvey Gibbs testified that he had a Relationship white had a relationship with miss Rogoway of a sordid sort or some some is a resort It's over something sordid that's a disclosure of a Sexual relationship, but no, it's not I I disagree with that because in the context of the entire disclosure is that Rogoway has gone with Gutierrez to the jail and she meets or I think it was Chino and she meets with white She meets white and Klein and that And and what he's concerned about why it's sorted is because she comes from a very nice family He doesn't disclose that they're having that he's being released on these furloughs which are also illegal and that they are meeting outside of out of the and that Harvey that White is reporting back to him. And what is the credibility? I mean, we've alleged and this is Leslie White's testimony is very detailed, but what's the That white and Row excuse me, Harvey Gibbs have a much more if you want to say sorted relationship, then he went on because This was disclosed and the Public Records Act Claiming that I filed a Mr. Gibbs attempted to get an order I don't know whether this was ever signed by a judge or not But it says here is it is hereby ordered that the Los Angeles County Sheriff permit the person of Leslie white Also known as Christopher James an inmate at the Los Angeles County Jail Booking number be wired for sound by the Los Angeles County District Attorney's Office in order to record any conversation with attorney Leslie Abramson between blah blah blah white and Harvey Gibbs had a much more intimate relationship than he led on. He wasn't just one of numerous informants seeking to get in the car as the expression goes in this particular case and It lends credibility to what Leslie why? Leslie White's testimony and he should have disclosed that and he put a stop to it. He By that's what I said. I go back to the Quote from Justice O'Connor the best way to tell a lie is to mix a little truth in it that order Proposed order you said you don't know it was ever signed No, and it's 1414 for the record. That's what we're talking about. I'm pointing to was that ever filed You know, I don't know and I don't know if it was signed and I think that's it. What's it? What's very important? I wasn't quite done. Yeah and the dates that you Didn't read but you referred to our July something from 1990. That's right 82 to July something else 1982 that's right. Okay, so that's several months before the 402 hearing, isn't it? No, it's after what I forgive me afterwards So at the time of that's what I meant to say trial going on So as of the time of the 402 hearing when there was disclosure by mr. Kiss this hadn't happened yet. This this draft order hadn't been created yet. Presumably That's correct. And I think that it's also really important to understand the context in which this case was prosecuted and what was going on in the Los Angeles County District Attorney's Office and The County Jail and the Sheriff's Department about which there can be no dispute, I mean all the minutiae and the specific facts, but this was a An office that had a lot of high-profile murder cases that was out of control particularly where the cases were weak There were jailhouse informants like Leslie White and Sidney Storch and a lot of others clamoring to testify in all of these cases And it was only after the revelations of Leslie White and I mean defense attorneys For example, you know or trying these cases and they all accounting on those are going to produce these jailhouse finches And they're really feeling I'm a total loss at what to do about how to fight this. This is just unbelievable until The Scandal came about July of 1982 that mr. Sanders trial started in May of 1982 The verdict came back in August of 1982. So what you've got is a draft order Right seeking permission to put a wire on mr. White to Well, miss Abramson was visiting We don't know anything mr. White, pardon me visiting mr. White Or he would have been I'm assuming at the jail so because of the county jail, could you read the order again? Yes It is hereby ordered That the Los Angeles County Sheriff may run the jail Permit the person of Leslie White also known as Christopher James an inmate at the Los Angeles County Jail module 700 Inmate number 6 6 2 6 0 1 9 be wired for sound by the Los Angeles County District Attorney's Office in order to record any Conversation with attorney Leslie White between 6 p.m. On July 2nd 1982 and 12 a.m. On July 5 1982 okay. So just to be clear your art your your your allegation is that this was prepared at least It looks like it was prepared during the time of mr. Sanders this trial Correct don't know if it was ever signed. You don't know if it was ever filed But your allegation is that there was an effort to record miss Abramson maybe or a discussion about that But not that she was not what she was talking to her client while she was talking to mr. White that's correct All right And so which claim does this fall within this falls with when the all the rogaway claims because it is evidence that when Harvey gifts testified at that Discovery hearing that white was not an agent of the police that he was not telling the truth So when you say all the rogaway claims, you're gonna have to do better that for me Brady we have Brady we have napoo part of your Brady claim Clearly. All right, and what else it's also part of the the napoo And the I because I believe I raised You know The napoo and the knowing use is either false material testimony by rogaway that she could identify Mr. Sanders or it's also a Perhaps knowing is a perjured testimony and I want to clarify that, you know before you go to anything else Brady Napoli There's there's two Eggers that there's there's two false claims as Well as a Brady claim I'm not arguing that he was trying to invade the defense. Okay. Well, I just tried to be clear I am not you've got Mooney and the pool and you've got Brady in your stuffing is art Is there any other clearly established the plain court authority that you're relying on for this claim? Well I just want to emphasize to that for example those furlough orders and the prosecution has always made a big Oh, well, it's in somebody else's name, you know, what was it Julian or a guy? and as the testimony developed by I think his name was Andrew Diamond the district attorney White wasn't doing anything for the Julian Argot case either. That's the way they did things They had it was very casual they had all these orders and the jail and the sheriff Joe Reed has also mentioned in one of the notes there he's running the Informants at the jail and he says to Leslie white you can't get out You're a sentence state prisoner. So he gets himself transferred to the Long Beach County Jail or in a city jail and then Paul Chastain the deputy says well if I can get an order Will you let me out? He goes? Yeah, sure. And so then diamond goes to Judge Leatham was sitting in Department 100 And you know Judge Leatham. I mean they sign all kinds of orders in Department 100 I'm you know, I'm there all the time myself, you know, but it's nothing to it We need this guy and they sign it and according to white He was he would just he was out gallivanting around Paul Chastain the sheriff's deputy said he was not being supervised He was out for days at a time and then he would come back and get another one He would turn himself in he was hanging around on the hardcore Everybody knew him. I mean these were basically employees of the district attorney's office and that was not disclosed there that mr White had any contact with mr. Malloy Don't know anything for you I Want to thank you folks for your argument stand and recess
judges: Christen, Nguyen, Watford